Filed 1/27/16  P. v. McBride CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JETT SIMMONS MCBRIDE,<br><br>    Defendant and Appellant. | F068949<br><br>(Super. Ct. No. F13901235)<br><br>**OPINION** |

-ooOoo-

        APPEAL from a judgment of the Superior Court of Fresno County.  Arlan L. Harrell, Judge.

        Sylvia Whatley Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

        Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Kevin L. Quade, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Jett Simmons McBride (defendant) was charged in Fresno County Superior Court with attempted murder in which he personally used a deadly weapon and personally inflicted great bodily injury (Pen. Code, §§ 187, subd. (a), 664, 12022, subd. (b)(1), 12022.7, subd. (a); count 1), assault with a deadly weapon in which he personally inflicted great bodily injury (*id.*, §§ 245, subd. (a)(1), 12022.7, subd. (a); counts 2 & 3), and battery (*id.*, § 242; count 4).  Defendant pled not guilty and not guilty by reason of insanity.  A jury acquitted him of counts 1 and 4, convicted him of counts 2 and 3 and found the special allegation true as to each count, and found he was insane at the time he committed the offenses.[1]  Pursuant to Penal Code section 1026, the trial court committed him to Atascadero State Hospital for a maximum term of nine years.

We now hold:  (1) The trial court did not abuse its discretion by excluding certain impeachment and demeanor evidence; (2) The trial court did not abuse its discretion by overruling defense objections to expert opinion testimony on the White supremacist nature of defendant's hospital remarks, and if it should have excluded references to defendant's admissions of statutory rape, the error was harmless; (3) Defendant is not entitled to reversal based on cumulative prejudice; but (4) Certain clerical errors should be corrected.  Accordingly, we order correction of those errors and affirm the judgment.

## FACTS[2]

### I

#### PROSECUTION EVIDENCE

---

[1]     As to counts 2 and 3, the information also alleged, and the jury found, defendant personally used a dangerous and deadly weapon within the meaning of Penal Code sections 667 and 1192.7.  (See *id.*, § 969f.)

[2]     Because defendant raises no issues concerning the sanity phase of trial, we summarize only the testimony presented at the guilt phase.

Undesignated dates in the statement of facts are to the year 2013.

*The Collision and Aftermath*

On February 1, Nelson Pereira, an equipment operator for Pacific Gas and Electric Company (PG&E), was working with Rayshawn Neely, Kenneth Simon, and Nicholas Starkey on a project at Marks and McKinley in Fresno. Around 2:00 p.m., they were on the northwest corner of the intersection, getting ready to perform a task on a corner pole. Neely and Simon were scheduled to go up in the "bucket," while Pereira and Starkey were going to remain on the ground.

Pereira was standing about 25 feet behind the bucket truck, which was facing west and coned off, when he observed a black sedan about 20 to 25 feet away, coming through the intersection into the immediate work area.[3] The black car was in the coned area, coming at the work crew at a speed of five to 10 miles per hour.

Pereira turned toward the vehicle to stand in front of it, put up his hands, and tried to get the attention of defendant, who was driving. Although Pereira was looking through the windshield, he was not able to make eye contact or get defendant's attention. Defendant had both hands on the steering wheel and was staring past Pereira in the direction of the bucket truck. He had a blank look on his face and did not acknowledge Pereira's presence at all. His hands remained in the 10 o'clock and 2 o'clock positions on the steering wheel the entire time; Pereira did not see the steering wheel move at all, nor did he see the car change direction or change its speed. Pereira could also see the passenger in the car; he was just sitting upright in his seat, motionless, facing forward with his arms close to his body in a normal position. He and defendant did not seem to be communicating with each other.

---

[3] The intersection was controlled by stop signs. Although there was only one traffic lane in each direction, the lane was wide, with shoulder parking. Accordingly, traffic going westbound on McKinley could still proceed in the regular lane of travel without going around the bucket truck, which was to the right of traffic.

Pereira pushed off the driver's side front quarter panel of the vehicle with his hands to keep the vehicle from colliding with him. He shouted in an attempt to get the attention of his coworkers and defendant, but the vehicle went right by him and collided with the bucket truck, pinning Neely — who had been at the back of the truck toward the passenger side, facing the truck — between the truck and the car.

Starkey and Simon, who were behind the bucket truck, heard Pereira shout. Starkey looked over his shoulder and saw a car coming straight for the bucket truck at a speed Starkey estimated was roughly 20 miles per hour. Simon approximated the car as going 20 to 25 miles an hour and remained constant. Defendant, the driver, had his arms completely locked, with his elbows straight and his hands at the 10 o'clock and 2 o'clock positions on the steering wheel. He was looking straight at the back of the bucket and the crew, all of whom were wearing orange safety vests. The passenger was sitting with his arms by his sides and his hands in his lap. No part of his body crossed toward the driver's side.

The vehicle never deviated from a straight line. If Starkey had not moved, it would have struck him. Simon tried to get out of the way, but the car struck his back and hips. He was thrown 10 to 15 feet alongside the bucket truck, and landed on his hands and knees with his head facing the car.[4] He jumped back up and saw that Neely was pinned between the truck and the car and screaming in pain.

Neely, whose cell phone had just rung as he approached the bucket truck, saw nothing before he was hit. He felt the impact and had a quick blackout. When he came to, he found himself essentially sitting on the hood of the car, as the front end of that vehicle was underneath the bucket truck. His lower body was pinned underneath and his head was against the windshield.

---

**4** As a result of being hit by the car, Simon sustained a chipped vertebra. He was placed on light duty for approximately six months, and still had occasional lower back and neck pain at the time he testified, more than 10 months after the incident.

Tonya Baker was across the street when she saw the PG&E crew with their truck at the corner and a black, mid-sized car coming right at the truck. Defendant was driving. Baker heard people screaming, but the car went straight at the truck. Baker and her daughter, Ginger Miller-Barraza, started across the street when Baker first saw the car.

Pereira ran to assess Neely's injuries and also called 911. He saw defendant stand up out of the vehicle and, while in the "V" of the doorway, lean his body over the hood where Neely was pinned. Pereira could not hear their conversation, but he saw defendant reach over and grab Neely's shoulders and pull on him. Starkey recalled defendant twice trying to get out of the car. Both times, Starkey slammed the door on him and told him to stay in the car.

Simon did not see what defendant did immediately after the crash. The passenger jumped out of the vehicle, however, and said, "What a wild fucking ride." Simon was trying to calm Neely down when he saw defendant get out of the car. Defendant immediately went up to Neely and announced he was Jesus Christ and was there to take Neely home.[5] Simon heard Neely tell defendant to get back. Others were also yelling at him to get back, and defendant turned around and went the other way for a bit. At some point, Simon grabbed Neely's phone and called Neely's wife.

A number of people came over to assist. Pereira recalled a woman wearing a Green Bay Packers T-shirt who said she was a nurse. Starkey recalled a person wearing hospital attire saying she was a CNA (certified nursing assistant) and could help.[6] As Starkey was talking to her, he noticed defendant had gotten out of the car. The passenger

---

[5] Simon also heard defendant say, right around the same time, that he was Jesus Christ and he was there to save Neely, and also that he was there to heal him. Defendant also leaned close and said something to Neely, but Simon could not hear what was said. He heard defendant say he was Jesus Christ numerous times. At some point, defendant said he was Jesus Christ and he could do what he wanted.

[6] Baker had been a registered nurse until 1982. Miller-Barraza had gone to her mother's location right after she finished her shift as a CNA.

was also out of the car and was standing on the passenger side. Starkey saw defendant walk over, grab Neely under the arms, and start pulling on him. Neely was screaming in pain and asked someone to get defendant off him. Starkey heard defendant say, "I am God. I am Jesus. I was sent here to take all the niggers to heaven."

Neely recalled two women approaching, with a bigger White male behind them. The man grabbed Neely's hand and calmly asked, "Do you believe in Jesus Christ, your Lord and Savior?" Neely, who just wanted the car off, said to get him away. The women started pushing the man back and telling him that he needed to move back. The man did not say anything else to Neely, and Neely did not hear him make any racist statements.

Someone suggested backing the vehicle away, but Pereira said it should not be moved. Because of the way in which Neely was pinned, with his legs underneath the bucket truck and his upper body resting on the hood of the vehicle, Pereira feared moving the car would cause Neely to lose his legs or sustain deeper cuts to them. Pereira then noticed the vehicle's keys were not in the ignition.

Baker and Miller-Barraza were on each side of the car, trying to calm Neely down. They agreed the car should not be moved. Baker recalled that everyone was yelling, and defendant started shouting, "All niggers need to die." He then said he was Jesus Christ and started pulling on Neely and telling him to repent for his sins.

Miller-Barraza recalled defendant "push[ing] with force" out of the car and yelling, "I'm Jesus Christ." After the car door was shut, he yelled, "Death to all niggers." Defendant subsequently reached over and grabbed Neely. He yelled, "I'm Jesus Christ. Do you believe in Jesus?" He told Neely that if Neely did not repent for his sins, Neely would go to hell, but that if Neely repented with him, Neely would go to heaven. He also said, "I can save you," a couple of times. Defendant then put his arms around Neely and tried to "rip" him from between the two vehicles. Neely was frantically screaming to get defendant off of him. Miller-Barraza, who was on the driver's side of the hood of the car, yelled at the PG&E workers to get defendant off of Neely.

6.

Baker ran to the other side of the car and got between Miller-Barraza and defendant.[7]  She pulled on the back of defendant's shirt, and he finally turned away from Miller-Barraza and went to get back in the car.  He said he was going to move the car, and Baker could see the top of a key in his hand.  She was determined not to let him get back in the car.  The next thing she knew, the keys went flying and defendant had her in a bear hug.  They were facing each other.  Defendant was squeezing her so hard, she could not move and it was difficult for her to breathe.  He was pounding her in the back with what felt like his fist, and he hit her in the head a few times.  He was also kissing her on the face, and telling her he was Jesus Christ.  She repeatedly told him to let her go, but to no avail.  The passenger pounded defendant on the back with his fists and what Baker originally thought was a hammer, telling him that he could not be hitting on women and to let Baker go.  Defendant still did not let go.  The passenger then struck defendant in the head and in the back a few more times, and defendant hit the ground.  Baker started to walk away, but defendant grabbed her leg.  She kicked him in the groin and he let go.  She then went to the other side of the car.  Because there were still no police or fire trucks at the scene, she took someone's cell phone, called 911, and reported there were guns and knives and people firing.

Pereira recalled that while he was still on the phone with 911, defendant and Baker got into an argument.  Defendant had his hands on Baker's shoulders.  Pereira believed defendant and Baker were facing each other.  According to Starkey, however, defendant became angry when Starkey and Baker pulled on him to get him off Neely.  Defendant turned around and began to bear hug Baker with his arms around her and his hands locked behind her back, squeezing.  Baker appeared to be in some danger, given defendant's large size.

---

[7]  After the statements defendant had made, Baker feared for her daughter, who was half-Black, and for Neely, who was Black.

7.

Starkey saw the passenger pull a hatchet out of his backpack and remove it from its leather sheath.  The passenger then nervously fidgeted around with the hatchet down at his side while he looked at everyone.  While defendant was still squeezing Baker, Starkey heard defendant say, "I will kill you all."  The passenger then hit defendant in the head with the hatchet.  Starkey only saw one blow, but Pereira and Simon saw the passenger strike defendant three times in the back of the head with the hatchet while the confrontation was occurring.  Defendant collapsed, bleeding from the head.

Simon saw the passenger start going around the back of the car with the hatchet still in his hand.  Simon and a coworker yelled at him to drop it.  The passenger looked back and forth, then set the hatchet down.  He took a step back, but then came forward and grabbed it again, saying, "He's coming back."  Simon looked back and saw defendant coming to the passenger side of the car.  The passenger ran northbound out of sight.

Starkey recalled the crowd's attention turning from defendant to the passenger.  As the crowd began to surround him, the passenger flailed the hatchet horizontally at them to keep them away.  No one was close enough to get hit.  Starkey heard a coworker say, "If you're not going to use it, leave," whereupon the passenger sprinted north as fast as he could with his backpack in one hand.  Although Starkey did not see him drop the hatchet, he saw it on the ground later.

Pereira and some of the others at the scene followed the passenger, whom Pereira described as walking briskly and carrying the hatchet and a backpack.  After going about 500 feet north on Marks, the passenger stopped, walked back in the direction of those following him, threw the hatchet on the ground, and sat down against the fence line.  One of the people who had been following him picked up the hatchet.

Pereira then returned to the scene, where he saw defendant standing on the passenger side of the car, physically trying to pull Neely out from between the vehicles.  Starkey saw defendant also pick up Neely's limp leg, which was sticking out on the side

8.

of the bucket truck.  Neely was yelling in pain.[8]  Neely was asking that defendant get off him, and Simon and Starkey grabbed defendant and took him to the ground.  At some point, Simon heard defendant say, "I'll whip all your asses," and something along the lines of, "I will fuck you all up."

Every time defendant — who was over six feet tall, probably weighed 250 to 280 pounds, and was larger than the other individuals at the scene — tried to get up, Starkey, Simon, and two other men pushed him back down.  Miller-Barraza believed it was around this time that defendant yelled, "Smite them, oh, smitey one.  They're not obeying you."  He was also saying other things about how they were not listening to the Lord.

Eventually defendant sort of gave up, lay there, and stripped off all his clothes.  Pereira did not see defendant do anything else, and did not recall if he was saying anything.  Starkey recalled defendant saying things along the lines of, "Let me go," and "Get off me."  Baker recalled defendant saying he wanted to have sex, although she did not see him touch any parts of his body.  He was trying to get up, but others were making him stay on the ground.

When law enforcement arrived, defendant was on the grass with Starkey holding him down.  Defendant was trying to push Starkey off so he could get up.  The officers told defendant to freeze and may have had their Tasers out.  Simon saw defendant push off the ground, throwing the officers back.  While on his knees, defendant said, "I am Sparta."  The officers tackled him again.  At some point while the police were there, Miller-Barraza observed defendant pulling on his penis and yelling, "Fuck me.  Fuck me. Fuck me."

---

[8]    When Neely was finally removed from between the vehicles, his foot was facing the wrong way.  Neely suffered six broken bones in his right leg and foot.  He needed surgery to have a steel rod inserted in his leg.  He was in a wheelchair for about four months, then on crutches for another couple of months.  As of the time he testified, he was still seeing a doctor on a regular basis.  The steel rod had not been removed yet, as the bones had not healed.

Fresno County Sheriff's Deputy Lyman arrived on the scene to find defendant lying on the ground in a grassy area with several officers and fire personnel around him. Defendant, who had been handcuffed, was nude. He appeared to be very angry and agitated and was yelling. Although he was bleeding around the head, he was still actively resisting the approximately six law enforcement and fire department personnel who were on top of him. Defendant was yelling, "I did it. Get off of me. I'll kill you all."

Fresno County Sheriff's Deputy Hall arrived on scene to find defendant lying on the grass, naked and handcuffed. She attempted to check out his injuries, but could not do so because of his demeanor and bizarre behavior. He claimed to be Jesus, and kept calling her Debbie and saying she knew him, although they had never met and her first name was Laura. He also would not stay still, and was ranting and hostile.

Hall went to the car to try to find some identification for defendant. Inside the center front console was a small plastic bag containing marijuana.[9] Eventually, defendant's identification — a California and a Washington driver's license, both in defendant's name — was located. Hall also looked for skid marks in the road and intersection. She did not find any.

Hall then went a short distance north on Marks, to where other deputies were talking to a person who identified himself as Edward Carl Nicodemus. It was pointed out to Hall that a hatchet and set of keys were in the general vicinity. Hall observed Nicodemus a couple of times. He was loud and animated, and appeared to be emotionally charged.

Deputy Lomeli responded to the hospital to interview Neely. Defendant was also being treated there. When Lomeli asked defendant his name, defendant yelled out "88"

---

[9] Laboratory analysis detected no substance in the plant material other than the active ingredient in marijuana. The testing would have shown methamphetamine, amphetamine, cocaine, cocaine base, PCP, heroin, opiates, LSD, Ecstasy, or ketamine, had any been present. Tests to determine potency were not conducted.

two or three times. From his training and experience in the gang unit and from speaking to White male adults in and out of custody, Lomeli knew 8 stood for the letter H, the eighth letter of the alphabet; hence, 88 stood for HH, which in turn stood for Heil Hitler.

California Highway Patrol Officer Vaccarezza responded to the hospital to stay with defendant, who was transported by ambulance. Defendant was unruly and belligerent. He was thrashing around on the gurney, yelling and screaming. He kept saying "88" and asked a male nurse in the emergency department "if he was a Jew." As a gang investigator with the gang unit, Vaccarezza had had classes that included the topics of White gangs and White supremacist groups. He learned that 8 represented H, the eighth letter of the alphabet, and that 88 stood for Heil Hitler. White supremacist groups said "88" and tattooed it on their bodies. Vaccarezza also heard defendant refer to himself as Jesus on several occasions.

Blood was drawn from defendant at the hospital. It tested positive for THC (marijuana) at a level that was capable of producing an intoxicating effect in some individuals. Tests were also performed for alcohol, opiates, PCP, methamphetamine, cocaine, bath salts, and methadone. The results were negative for all. In addition, no LSD was detected.

### *Caleb McGillivary's Testimony*[10]

On February 1, McGillivary was hitchhiking in Bakersfield, when defendant picked him up in a black Oldsmobile. Defendant, who said the car belonged to him, and McGillivary were the only occupants of the vehicle, and McGillivary got in the front passenger seat.

The two traveled to Fresno, with defendant driving the whole way. During the trip, they discussed religion. Defendant cited numerology in a way that was "shaded by

---

**10** Caleb "Kai" McGillivary testified at the preliminary hearing, but was not available at trial, as discussed in more detail, *post*. Accordingly, his preliminary hearing testimony was read to the jury.

11.

his own prejudicial kind of mainstream fundamentalist Christian views." He did not refer to himself as Jesus during this time. Defendant said he was a successful custom motorbike mechanic who shipped to people all over the country, and that he had a Japanese wife. He also said he was involved in Christian organizations, although he did not elaborate on their nature, and that he was from Tacoma, Washington, and was headed back there. Defendant did not talk about the color of people's skin; had McGillivary "known about that," he "would have hopped on out."

In Fresno, the two men stopped in the Tower District, where defendant gave McGillivary money with which to buy them some marijuana. McGillivary purchased a baggie of it, which he placed in the console at defendant's direction, then they drove to a recycling depot and shared a joint while they waited for the car radiator to cool down.[11] McGillivary put some water in the radiator and advised defendant to turn on the heating core, and they were able to get the car back on its way. Defendant smoked about a quarter of the joint; McGillivary, who rated the marijuana's potency as two or three on a scale of one to 10, with 10 being the most potent, was feeling "[g]narly and mellow."

After they left the recycling center, defendant started talking about how, when he was 30, he went to the Virgin Islands and raped a 14-year-old. McGillivary asked what he meant by rape — whether he held her down or it was statutory. Defendant would not answer the question, despite McGillivary repeatedly asking, and McGillivary began to wonder where defendant was taking him.

Defendant said he had come to realize he was Jesus Christ and he could get away with anything he wanted to. McGillivary — who could not say how fast the car was going because he was just staring at the dashboard while still trying to deal with the fact defendant said he raped the girl — looked up and saw a whole crew of construction

---

[11] Defendant had noticed the radiator overheating while they stopped to get the marijuana.

people. Defendant intentionally steered right toward them with both hands on the wheel.[12] There was no way he could not have seen them. Most of the people jumped aside, but one man got pinned underneath. Defendant just sat there with a "fucking evil grin" on his face. There were about six workers in front of the car; defendant drove the car at all of them. He said, "watch this" and simultaneously drove into Neely, who was African-American. He pointed with his chin and said, "this guy."

McGillivary got out of the car and went to look at Neely. Neely, who was pinned, said to get the car off him. McGillivary responded that Neely did not want the car off. McGillivary told one of the crew members that Neely needed him to call his wife, and that that was all the man could do for Neely.[13]

McGillivary then reached back into the car and grabbed the keys, as he had seen how "mangled" Neely was and how he was asking people to move the car. He also grabbed his bag, which he threw by a light post. Miller-Barraza went to help Neely. Baker was going over to help defendant, although McGillivary warned her defendant was crazy.

When Baker started going toward him, defendant got out of the car and started toward her. He then "threw his arms real wide." McGillivary could see defendant was about to grab Baker, so he grabbed a tomahawk from inside the bag and told defendant to get away from her. McGillivary warned him three times not to touch her. Defendant did not listen, however, and grabbed Baker around the head. McGillivary then ran up and "smashed" him in the back of the head with the hatchet. Defendant was "still on her," so McGillivary "smashed" him again. Defendant still had hold of Baker's hair, so McGillivary said, "this fucking answer here, bud," and "smashed him real good and hard

---

[12] At no time did McGillivary touch the steering wheel. He could not recall if defendant stopped at the intersection before driving at the crew.

[13] At the time, McGillivary was not sure Neely would survive.

and he dropped in a fucking heap." McGillivary was concerned defendant was going to kill Baker and, if he had not taken the keys out of the ignition, everyone else there.

Defendant was yelling at McGillivary that he was going to "kill us." Other people were also yelling at McGillivary, who was holding defendant down with the edge of the hatchet pointed out. Defendant then stood up and demanded the keys. McGillivary told defendant to come get them. McGillivary pulled out a pocket knife. He was concerned defendant was going to grab the keys from him and drive the car into the rest of the people there, so his intention was to try to lure defendant away from the scene.

McGillivary ran off so defendant could not get to the keys, and because he thought defendant would follow him. He ran along Marks. When people told him to stop, he turned around and dropped the bag with the hatchet and the knife.

When contacted by law enforcement officers, McGillivary gave his name as Edward Carl Nicodemus. He did not give them the name; rather, that was the name he told them to call him by. He also told them he was from Columbus, Missouri. That was where he was from, "[i]n a way." Although he had never been there, friends from there said he was welcome anytime. He lived everywhere he went. When he spoke to a reporter after the incident, he said he was from Sophia, West Virginia. He was actually born in Canada, however.

## II

### DEFENSE EVIDENCE

At around 2:00 p.m. on February 1, Mark Walker was driving eastbound on McKinley, approaching Marks. As he was coming up to the stop sign, the car traveling westbound started to go after stopping at the stop sign. After it crossed the intersection, it started moving toward, and then veered into, the back of a PG&E truck. Seeing someone pinned between the car and the back of the truck, Walker stopped to help.

When Walker reached the location, the driver — defendant — and passenger were still in the car. There were PG&E workers on the passenger side of the vehicle, and two

14.

women were approaching from across the street. Just as the women got there, the passenger reached over and took the keys out of the ignition, then got out of the car. He was "spouting off stuff," saying "That was a hell of a ride" and to call the injured man's wife. The women said they were nurses; the younger one went to the driver's side of the car, while the older one went to the man who was pinned. The passenger got his backpack and set it by a tree, and he stood by the tree.

The driver got out of the car and tried to move the vehicle back. The driver did not say anything, and Walker, who was standing right next to the car, never heard him make any racial remarks. Walker asked if he should be moving the car, whereupon the older lady started yelling, "Don't move the fucking car." She asked who was driving the car, and Walker pointed to the person. The younger woman also said not to move the car, although she spoke calmly and explained it could make the injured man bleed out more. There was nobody else around at that point that Walker recalled.

Walker told the driver that the women said not to move the car. The driver stopped trying to move it, then went around to the front of the vehicle, took the hand of the injured man, and asked if he accepted Jesus Christ as his personal Lord and Savior. The driver did not touch the injured man in any other manner. As far as Walker could tell, the injured man did not respond to the driver's statement, as he was in pain.

The older lady then came around the car, nudged Walker out of the way, and jumped on the driver's back, hitting him and trying to pull him. She asked something like why he was asking the man about Jesus Christ and why he did this. The driver then stood up, turned around, and stated that he was Jesus Christ and would "whip everybody's ass." The woman, who was now right in front of the driver, started hitting him and spouting off again, so he put her in a bear hug to stop her from hitting him. The passenger then came around and hit the driver in the back of the head with a hatchet about five times, and dropped him. As far as Walker was aware, there were no other people in the immediate area.

15.

The driver got back up after a couple seconds, whereupon the passenger ran around to the other side of the car, picked up his backpack, and headed down the street. The driver just stood there, holding the back of his head. Walker got in his truck and went after the passenger.

Seeing that other people had run after the passenger and caught up to him, Walker went on to work. He did not talk to law enforcement that day, although he attempted to contact them later on.

Defendant testified that as of January, he had been living with his wife, Donna, in Tacoma, Washington for almost three years.[14] The two had been married just under six years. Although defendant had been unemployed since October 2010, he previously worked at a motorcycle salvage yard.

Donna was scheduled to be in Atlanta, Georgia, on a business trip from Monday, January 28, until Thursday, January 31. The couple had a big argument the night before about an affair defendant had five years earlier, and their farewell, when he dropped her off at the airport, was a "cold" one.[15]

On his way home that Monday, defendant stopped and bought a bottle of Scotch. About 10:30 that night, he decided to go to Coeur d'Alene, Idaho. It was someplace he and his brother had always talked about going, and defendant had been drinking and was upset about his wife. He left home in his car with his dog and drove to Ellensburg, Washington. On the way out of Tacoma, he threw away his cell phone. Defendant thought somebody was trying to track him to kill him, because he had been posting things on the Internet about Hillary Clinton. She resigned the day after his negative posts about

---

[14]     For sake of clarity, we refer to Donna McBride by her first name. No disrespect is intended.

[15]     Defendant explained that he had been fasting, praying, and suffocating for several weeks prior to coming into the Holy Spirit. He felt cleansed of his sins. This is one of the reasons he told his wife about what he had done five years earlier.

16.

her; he thought he caused her resignation. For the same reason, he left his dog, whom he believed was "chipped," on the side of the road by a freeway exit.[16]

Upon reaching Ellensburg, defendant got a hotel room because he was tired. Upset and unable to sleep that night, he started driving again early the next morning. He drove for about two hours, then pulled over in Moses Lake, Washington. He was having delusions that he was Jesus Christ, saw Moses Lake, and thought this was where Moses would be.[17]

Defendant was very tired, so he looked for another hotel. There was one called the Oasis, but he said no. Then he saw another hotel called the Shilo Inn. This made more sense to him "[b]iblically," so he checked in. It was still Tuesday morning. He napped for about an hour, then started watching the news. At some point, he started writing in the Bible that he had. He starting thinking he was Jesus Christ and he was writing in the book of life.

Defendant sat in bed, watched the news, and wrote in the Bible all Tuesday and into Wednesday. He had no communication with his wife or any other friends or family. He was not drinking or using drugs.

At some point (defendant believed around 2:00 Wednesday afternoon), defendant noticed a Native American man outside his window, standing in a field about 75 yards away. The man had his arms outstretched and was doing a dance around a rock. He appeared to be chanting. Believing it was a real person, defendant shouted out to him and asked if he wanted any water. The man said he was fine. Defendant called out to him every hour. He saw the man all night.

---

[16] The dog, Zoe, did indeed have a chip. She was rescued, Donna was notified, and Zoe was fine.

[17] Defendant had been hardly sleeping since Christmas. He had been having delusions he was Jesus Christ since about January 24 or 25.

17.

Defendant did not sleep Tuesday night to Wednesday morning. On Wednesday morning, he called the police to report a murder.[18] Two officers from the Moses Lake Police Department came to his hotel room. They spoke for 15 to 20 minutes. Defendant was upset, and the officers asked if he wanted to go to a community psychiatric clinic. He agreed, and they took him to the clinic, where he remained for two to three hours. Meanwhile, the car he was driving — a black Oldsmobile that belonged to Donna — was at the hotel.

Someone from the clinic gave defendant a ride back to the hotel. He checked out and headed back to Tacoma. Donna was supposed to come home the next day, and, after talking to the people at the clinic, he thought it was a good idea for him to go home.

Upon his return home on Wednesday, defendant spent the day around the house. He also telephoned Donna. She said she had been calling him, and that someone heard his phone ringing and found it. She gave defendant the number of the person, and defendant retrieved his phone.

Defendant returned home, drank Scotch, and "surfed" on the computer. While on the Internet, he learned there was going to be a terrorist bombing at the Super Bowl. He had been tracking conspiracy theories on the Internet, and felt, based on the numbers and what he perceived to be a terrorist threat, it was going to happen.

Defendant packed his bags and got in the car that night. He planned to go to New Orleans, where the Super Bowl would be held that Sunday, to warn people there would be an explosion. He broke his phone in half in a parking lot and threw the pieces in some

---

**18**     Defendant reported that his brother, who had been dead since May 2001, had committed a murder. Defendant did not realize, until he saw the police report, that he used his brother's name. He made the report because he was cleansing his sins, and it was something that had weighed on his conscience since his brother told him about it when defendant was about age 15.

18.

bushes. He did not want any contact with his wife, and did not want to be tracked. He thought the government, CIA, FBI, and Department of Defense were tracking him.

Defendant got on Interstate 5 and drove south for about six hours. He stopped at a rest stop in Oregon for about two hours and tried to sleep, but he could not. He then got back on Interstate 5 and continued south. The sun came up Thursday morning while he was driving in the Shasta/Redding area.

Defendant continued driving until it got dark again. He stopped at a truck stop in Paso Robles for two or three hours, then drove to Bakersfield. There, he started heading toward Barstow to get on Interstate 40, having changed his plans and decided to go to Memphis instead of New Orleans. He felt he had more friends in Memphis, and would be more effective if he met up with them and discussed a plan for stopping the terrorist attack. Prior to reaching Bakersfield, defendant had been passed by two or three white utility trucks. He felt they were the Illuminati following him, and that they were going to try to kill him.[19]

Upon reaching Bakersfield, defendant felt exhausted and got a room at the Vagabond Inn. This was around 8:00 or 9:00 p.m. on Thursday. He took a shower, watched television, relaxed, and drank some Scotch. He was finally able to fall asleep.

When defendant woke the next morning, he "got on" his laptop computer and saw that Donna's nephew was trying to reach him by e-mail, as was Donna, because defendant was supposed to pick her up at the airport Thursday afternoon. By now, it was Friday morning. Defendant telephoned the nephew, then spoke to Donna for 10 or 15 minutes. He then "[g]ot back on" the computer and listened to some songs and posted some songs on Facebook. He felt like he was in the Holy Spirit. He was remorseful and wanted to go home to his wife.

---

**19**     By the Illuminati, defendant meant 10 families who ruled the world as bankers.

Defendant packed his belongings, left the Bible on the side of the bed, left a $20 tip and a note for the maid, put the empty Scotch bottle under the bed, and drove off. This was sometime between 10:30 and 11:00 a.m. As he got on the on-ramp to northbound State Route 99 near the hotel, he picked up a hitchhiker. He did not notice anything unusual about the man or talk to him before he let him in the car; defendant had picked up hitchhikers and helped out homeless people all his life. The hitchhiker, who introduced himself as Kai, asked if defendant was going to Fresno. Defendant said yes, that he was going all the way to Tacoma.

Defendant and McGillivary started talking, and defendant noticed McGillivary looked like defendant's brother. God, numerology, and Illuminati were some of the subjects of their conversation. There were other topics as well, with McGillivary asking defendant at one point if defendant liked Wal-Mart.

After driving about 30 minutes, defendant stopped at a location with two gas stations and a small hotel. He had noticed McGillivary was smoking, and asked if he was hungry. McGillivary said yes, that he had not eaten in a couple days. Defendant gave him $20 and told him to go into the store and get some food. Meanwhile, defendant filled up the car with gas. They left after about 10 minutes with their purchases, which included two gallons of drinking water. Defendant drank bottled water and had also noticed the car had been overheating a bit.

Defendant and McGillivary drove to Fresno, still talking during the drive.[20]  In Fresno, McGillivary said he had to use the restroom. He told defendant where to get off the freeway and started directing him through town. Defendant did not know their location, but believed they were close to the Tower District, because McGillivary said he knew the Tower District. McGillivary asked if defendant wanted to smoke some

---

[20]    At no time that morning did anyone but defendant drive the car.

marijuana.  When defendant said okay, McGillivary directed him to pull into a small convenience store, as he said the man over there probably had some.

Defendant pulled into the store's parking lot and gave McGillivary $40. McGillivary went over to a man and they disappeared around the back of the store.  They were out of view of defendant, who was sitting in the car, for 20 minutes, then McGillivary returned.  He got back in the car and pulled out some rolling papers and rolled the marijuana into a joint.  Defendant started to drive, with McGillivary telling him where to turn.  Defendant had never been to Fresno.

Defendant noticed the car was overheating about 15 to 20 minutes after they left the convenience store.  He pulled into a wrecking or recycling yard with a large parking lot.  McGillivary lit the joint while they were sitting in the car.  They passed it back and forth, both smoking it, for about five minutes.[21]  McGillivary then got out and put water in the radiator.  Defendant noticed McGillivary was putting the water first in his mouth and then into the overflow part of the radiator, and he was humming.  Defendant felt relaxed from the marijuana.  He was a medical marijuana user and bought his marijuana from a collective.  This marijuana tasted "fine" and "weird" — different from what he normally smoked.

During the 20 to 30 minutes they sat in the car in the parking lot, McGillivary told defendant to turn on the heater so the car would cool off.  In addition, they had a "deep" conversation.  They talked about family and where both were from.  In addition, defendant told McGillivary about a girl he slept with in the Virgin Islands about 30 or 35 years earlier.  Defendant then held McGillivary's hands and kind of leaned over and gave him a hug.  McGillivary hugged him back.  Defendant was depressed and distraught.  He was crying, because he was upset about his wife.

---

[21]    Defendant took two or three puffs, then handed it back to McGillivary.  He believed McGillivary smoked most of it, then put it out.

After about 10 minutes, they got back on the road with defendant again driving. McGillivary was not directing defendant; defendant was going in what he assumed was the direction of State Route 99. As defendant pulled onto the road by the recycling place, however, McGillivary started telling defendant some "weird stuff." McGillivary started to get angry. He began to get fidgety and started to cuss more. Some of the things he told defendant made defendant scared for his life, and defendant started looking for a place to get him out of the car.

Defendant had been driving about a minute when he came to a stop sign and stopped. While he waited for a car to pass, he and McGillivary were talking. Defendant told McGillivary that he needed to find a place to let him out. McGillivary was angry and punched defendant on the side of the face.[22] Defendant was just pulling through the intersection. McGillivary said the workers were planting a bomb. Defendant replied, "Oh, whatever." The next thing he knew, he was running into the back of the PG&E truck. Defendant could see the truck while at the stop sign, but was not looking at it. He was talking to McGillivary and just wanted to get him out of there. Defendant remembered looking up and seeing some men move out of the way, and he hit the truck. It happened very quickly. The collision did not cause the airbags to deploy.

After the collision, defendant saw a man — Neely — sitting on the hood of defendant's car. He was cursing and waving his arms and yelling to get the car off of him. McGillivary told defendant not to get out of the car, but defendant did anyway and went around to check on Neely. He was not paying attention to McGillivary and did not know if he remained in the car.

Defendant opened the car door and stood up. He tried to pull back on the car to move it, but then looked down and saw the car was in "park" and the keys were out of the

---

**22** Defendant variously gave the location of the blow as the side of the face and the back of the head. He admitted that he never mentioned it to anyone prior to his testimony at trial.

ignition.  Neely was still yelling about getting the car off of him, and defendant tried to pull the car back by throwing his weight against the doorjamb.  He only tried for a second, as he discovered he could not move the vehicle.  He was not aware of other people around him.

Defendant shut the door on the driver's side and went around to Neely to check his injuries.  He did not know McGillivary's location.  He could sense a presence, but was not looking at or talking to anyone.  He could not hear other people saying things to him.

Defendant slid up on the hood next to Neely, grabbed his hand, and asked him if he believed in Jesus Christ as his Savior and Lord.  Defendant was not sure why he did that; he just wanted Neely to be okay, and it was his first reaction.  Neely responded, "Yes, yes, yes," and defendant told him he was going to be okay and defendant was going to get him out of this.  That was about the last thing defendant remembered.  There was a heavy weight on his back and he felt oppressed.  He did not hear anything.  He believed Neely was saying, "Get away from me."  Defendant had no idea what happened next.  The next thing he remembered, he was standing up on the other side of the car, pulling on the back of the car from the rear passenger fender well.  At that point, he felt like someone was trying to kill him, but he did not know why.  He did not really have any feeling or emotion at that point.  He just felt totally alone, although he was probably feeling physical pain.  He felt numb, and it was like his ears were ringing.  He was not cognizant of a head injury at that moment, although he felt weak and dizzy.  He did not become aware he had a head injury until he awoke in the hospital.

Defendant remembered going back and placing one hand on Neely's thigh and the other behind Neely's back.  In defendant's mind, he was trying to heal Neely at the time.  He was thinking that he had the Holy Spirit in him, and that he could at least take away some of Neely's pain and heal his leg if he could not move the car.  At this point,

defendant believed, to some extent, that he was Jesus Christ.**23** Defendant did not recall saying anything to Neely, although he may have said "God bless you" or something similar. At no time did defendant make any racial statements to Neely or use a racial epithet.

Neely turned around and said, "Get this fucker off of me." Defendant got knocked down, and it felt like there was a crowd of people around him. He was lying on some grass. He felt sick. He tried to stand back up and kept getting knocked down. He felt like people were trying to kill him. They were all around him. Someone grabbed his neck. Someone pushed him down. Someone put a boot in his face. Someone put a knee in his back. He did not recall them saying anything to him; all he recalled saying was, "Get off of me."

Defendant was not aware of any injuries to himself at that time. He thought he was dying, however, and took his clothes off. He thought he was a witness to the end times, and that if the people were going to kill him, then they were going to drag his body through the street, naked.**24** Defendant thought he might have been Enoch, a prophet who was seventh in line from Adam in Genesis and a direct ascendant of Jesus Christ.

The next thing defendant remembered, he was lying on the grass and saw a blonde sheriff's deputy. At the time, he thought it was Debbie, with whom he worked and from whom he rented a room when he was teaching school in Reno Valley. He asked her to help him. She walked over and acknowledged him, and that was the last thing he remembered. He blacked out and thought he was dead. It was like he saw Jesus being put on the cross and the cross placed in the ground, and defendant was asking forgiveness

---

**23**     Defendant explained that when he said he was Jesus Christ, it did not necessarily mean he was the man Jesus Christ, but rather that he had the Holy Spirit of Jesus Christ in him.

**24**     Defendant explained that there were two witnesses in the end times. They were in Jerusalem, and were stripped of their clothes and beaten to death. Their bodies then lay naked in the street for three and a half days, after which they rose again.

for all his sins.  He did not remember being placed on a gurney or going into an ambulance.

The next thing defendant remembered, his dad was "pulling [him] up by the ocean."  His father said, "There you are," whereupon defendant came to on the table to find people pulling oxygen masks off his face.  He was in an emergency room.  One of the doctors was standing over him.  The man had a beard.  Defendant thought it was Jesus.

Defendant, who was in a lot of pain, remembered receiving staples in his head.  In addition, his finger was split open.  His knees were skinned and he had bruises on his face.  At the time, he did not know how he had been injured.  He was placed on "a pretty steady diet of Vicodin after that" and possibly also given morphine or Demerol.

Defendant was taken to jail either that night or the following evening.  On Monday, February 4, he talked with Detectives Stricker and Chatman.  Before he spoke with them, he talked with Donna two or three times.  He was Jett McBride again, although he still felt he was "in the Holy Spirit."

The number 88 meant several things to defendant.  It was the number that came after 87.  It also meant infinity to him, since 8 turned sideways was the symbol for infinity, and so 88 meant forever and ever.  It also meant Psalm 88, which was dear to him.  Defendant talked to Stricker about the Illuminati card game, in which he thought 88 was one of the cards.  He had never had anything to do with Hitler or any hate group or any Skinheads, and had never before heard that 88 had any connection with White Nazi street gangs.  He admitted, however, that he wrote, in a notebook found in his car, "Hitler, BDA, 4-20."  He also circled Hitler's birthday — April 20 — on the calendar in his car and wrote "Hitler."  Hitler's birthday was not relevant to him; beneath that defendant had written "Horizon," to denote the irony that the two-year anniversary of the Horizon oil spill in the Gulf in 2011 happened to be on Hitler's birthday.  Hitler and the Horizon were connected in defendant's mind; the Illuminati do things "by the numbers,"

25.

and catastrophes have certain connections to certain people. While the Horizon disaster occurring on Hitler's birthday was a coincidence, defendant believed it was intentional rather than accidental.

Defendant admitted to Stricker that he "did it." He meant he was driving the car and, although he was not sure exactly what happened, he ran into the back of the truck and hit people. He did not intend to hurt anybody and was not trying to kill anyone. Defendant did not tell Stricker that McGillivary had punched him in the face, as he could not remember everything that happened on the day in question. When he was at the hospital, however, there was a contusion on the right side of his face and on his temple from McGillivary hitting him.

When defendant was punched in the head, he lost consciousness. McGillivary jerked the wheel, which was why the car went into the PG&E truck. Defendant told Donna and Stricker that he thought McGillivary might have grabbed the wheel. Defendant just knew something happened in the car, but he was not really sure at the time. With his head injury later on, he did not remember things for two or three weeks.[25]

Defendant admitted telling the detective that he hit the truck on purpose and tried to kill Neely. He denied doing it because Neely was Black, but agreed he did it because Neely was Illuminati.[26] Defendant then told the detective he had been driving the car and

---

[25] Defendant admitted that before he knew what McGillivary said regarding the incident, defendant told Donna that he loved McGillivary to death and thought he was the "coolest son-of-a-bitch" defendant ever met. Defendant also talked to Donna about bringing McGillivary up to live with them and wanting to adopt him. It was only after Donna told defendant what McGillivary said about defendant saying he was going to "clean[] all the niggers out" and ramming his car into Neely, that defendant said McGillivary jerked the wheel.

[26] Defendant explained at trial that Illuminati are like rulers. They are not people who work on the side of the road. He explained this to the detectives earlier in the interview. So when he was asked if he tried to kill Neely because Neely was Illuminati, he responded "yeah" in a condescending way. He did not mean he was agreeing. He did not try to kill Neely because he was an Illuminati. Similarly, his affirmative responses to

could not say whether McGillivary grabbed the wheel. He thought the marijuana had been laced with PCP.[27]

Defendant's view of himself the week before February 1 was different than it was at the time he testified. He believed he had the same powers at the time of trial that he had before February 1. The difference was that by the time of trial, he had had a lot of sleep. He blamed Donna for snoring and keeping him awake. He believed he had had a brief reactive psychosis due to sleep deprivation.[28]

## DISCUSSION

### I

#### EXCLUSION OF IMPEACHMENT EVIDENCE

**A.** **Background**

After McGillivary testified at defendant's preliminary hearing, but before defendant's trial, McGillivary was arrested in New Jersey and indicted for murder. The prosecutor was unable to secure his attendance at defendant's trial, and his preliminary hearing testimony was read to the jury. (Evid. Code,[29] §§ 1290, 1291; see § 240,

---

whether he hit the truck on purpose and tried to kill Neely were also meant in a condescending manner. According to Stricker, however, defendant did not respond to these questions in a condescending manner. The only time defendant spoke condescendingly was when Stricker asked him who Satan was. Defendant looked at Stricker's partner and said, in a condescending tone, "Tell him who Satan is." Defendant did, however, become emotional during the interview and express remorse for hurting Neely.

[27] Defendant explained he was delusional when he spoke with the detectives. He was suffering from concussion syndrome. He was also on Vicodin. According to Stricker, however, when Stricker contacted defendant to interview him on February 4, Stricker asked how he was feeling, and defendant said "great." Stricker did not observe any injuries to defendant's face or temples, and defendant did not complain about any injuries to those areas.

[28] Defendant conceded Donna had been snoring for eight years. In the two weeks before the incident, however, he was fasting and not sleeping on purpose.

[29] Further statutory references are to the Evidence Code unless otherwise stated.

27.

subd. (a)(4).) The prosecutor moved, in limine, to exclude evidence of the arrest and indictment as irrelevant. Defendant sought to impeach McGillivary's credibility with that evidence and with McGillivary's demeanor while testifying at the preliminary hearing.[30] After argument and briefing on the issues, the trial court ruled either party could use McGillivary's misdemeanor conviction for defrauding an innkeeper (Pen. Code, § 537, subd. (a)(1)), or the underlying conduct, for impeachment purposes. As to McGillivary's arrest, indictment, and demeanor while testifying, however, the court stated:

> "This case gained some notoriety, and it was for that reason we did the [juror] questionnaires, … in large part, because of the colorfulness of Mr. McGillivary. That was plainly on display in the photographs that the Defense attached to their points and authorities in this case.

> "But the difficulty is that while attempting to focus attention on the colorfulness of this witness, it seems to detract from what is at issue in this case, and that is, the events earlier this year … allegedly involving Mr. McBride. This case is not about Kai, the hitchhiker, basically. It's not. It is not about what happened in New Jersey .… It is not about whether that individual, Mr. McGillivary, was raped and for that reason killed another individual in New Jersey, as has been portrayed in the media. And all of these things, … if the Court were to allow reference to Mr. McGillivary's arrest in May of 2013, all of these issues would be placed in front of the jury. What happened, why did it happen, involving someone who is not really the focus of the events alleged here.

> "So the Court is going to preclude either side from mentioning the arrest of Mr. McGillivary in May of 2013. It is clear to the Court that the arrest, which came … months after Mr. McGillivary's testimony at the preliminary hearing in this case, is not relevant as to his credibility at the time of his testimony in this case. Because the arrest came so long after the testimony there is no likelihood that Mr. McGillivary was motivated by any attempt to gain leniency or to gain favor by testifying untruthfully at the preliminary hearing here. And that is the basis for allowing prior convictions or misconduct to be allowed … to impeach an individual during the course of a proceeding, is to show that this person is not to be

---

[30] Defendant sought to use video and/or photographs from media coverage of McGillivary testifying at the preliminary hearing.

believed based upon their past experience, prior experiences to that witness's taking the witness stand. We just don't have this here.

"So the Court is concerned that not only would there be a confusion of the issues, but allowing that testimony concerning Mr. McGillivary's 2013 arrest would mislead the jury to suggest that maybe he somehow had something to gain by testifying at the preliminary hearing.

"Now, I hear the Defense that Mr. McGillivary was possibly playing to the cameras. That is a possibility. And I suspect that in hearing the preliminary hearing testimony and impeachment with any prior statements that Mr. McGillivary gave to law enforcement or others, that can be brought out. But the Court is going to preclude either side from making any mention of Mr. McGillivary's May 2013 arrest under Evidence Code section 352."

Jurors subsequently were instructed that in evaluating a witness's testimony, they could consider "anything that reasonably tends to prove or disprove the truth or accuracy of that testimony," including, inter alia, the witness's behavior while testifying, the witness's attitude about the case or about testifying, whether the witness had been convicted of a felony, and whether the witness engaged in other conduct that reflected on his or her believability. They were also told McGillivary's testimony was to be evaluated by the same standards that applied to witnesses who testified "here in court."

Defendant now contends the trial court erred by excluding the proffered evidence, and that the error violated his rights to due process and to present a meaningful defense. We conclude the trial court acted well within its discretion.

## B. <u>Analysis</u>

Except as provided by statute, a jury "may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing," including the witness's demeanor while testifying and the manner in which he or she testifies, the character of the witness's testimony, and the witness's attitude toward the action in which he or she testifies or toward the giving of testimony. (§ 780, subds. (a), (b) & (j).) Thus, a witness's

29.

demeanor is always *relevant* to his or her credibility. (*People v. Lopez* (2013) 56 Cal.4th 1028, 1064.) While relevance is a prerequisite for admissibility under section 350, however, section 352 gives a trial court discretion to exclude relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (See *People v. Gonzalez* (2006) 38 Cal.4th 932, 950.)

In a similar vein,

> "A witness may be impeached with any prior conduct involving moral turpitude whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion under … section 352. [Citations.]

> "'[T]he admissibility of any past misconduct for impeachment is limited at the outset by the relevance requirement of moral turpitude. Beyond this, the latitude … section 352 allows for exclusion of impeachment evidence in individual cases is broad.' [Citations.] When determining whether to admit a prior conviction for impeachment purposes, the court should consider, among other factors, whether it reflects on the witness's honesty or veracity, whether it is near or remote in time, [and, where the witness is the defendant,] whether it is for the same or similar conduct as the charged offense, and what effect its admission would have on the defendant's decision to testify. [Citations.] Additional considerations apply when the proffered impeachment evidence is misconduct other than a prior conviction. This is because such misconduct generally is less probative of immoral character or dishonesty and may involve problems involving proof, unfair surprise, and the evaluation of moral turpitude. [Citation.] As [the California Supreme Court has] advised, 'courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value.' [Citation.]

> "Because the court's discretion to admit or exclude impeachment evidence 'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation], a reviewing court ordinarily will uphold the trial court's exercise of discretion. [Citations.]" (*People v. Clark* (2011) 52 Cal.4th 856, 931-932, fn. omitted.)

Murder shows a "readiness to do evil"; hence, it is a crime involving moral turpitude, and so is an impeaching offense. (*People v. Edwards* (2013) 57 Cal.4th 658, 722; *People v. Castro* (1985) 38 Cal.3d 301, 314.) Because murder involves moral turpitude, it may suggest a willingness to lie. (*People v. Wheeler* (1992) 4 Cal.4th 284, 295.) This is so even though the immoral trait is one other than dishonesty. (*People v. Castro*, *supra*, 38 Cal.3d at p. 315.) Murder and other acts of violence are, however, less probative on the issue of credibility than, for example, perjury or defrauding an innkeeper. (See *People v. Rollo* (1977) 20 Cal.3d 109, 118, superseded on another ground by constitutional amendment as stated in *People v. Castro*, *supra*, 38 Cal.3d at p. 308.)

Because McGillivary's arrest and indictment for murder postdated when he actually testified, but antedated the presentation of his testimony to defendant's jury, a question arises whether we deal here with the type of "past" misconduct normally used for impeachment. On the one hand, McGillivary's testimony cannot have been influenced by criminal proceedings that had not yet occurred. (See *People v. Rodriguez* (1986) 42 Cal.3d 730, 750 [accused is entitled to explore on cross-examination inducements from prosecution that may have motivated witness's testimony]; *People v. Coyer* (1983) 142 Cal.App.3d 839, 842 [pendency of criminal charges is material to witness's motivation in testifying even where no express promises of leniency have been made].) On the other hand, the California Supreme Court has suggested it is sufficient — at least in cases not involving former testimony admitted pursuant to section 1291 — that the impeaching offense predate trial. (See *People v. Edwards*, *supra*, 57 Cal.4th at p. 722; *People v. Hinton* (2006) 37 Cal.4th 839, 887.) "The admission of evidence concerning the witnesses's [*sic*] prior [conduct] tests his or her credibility as a witness during trial." (*People v. Halsey* (1993) 21 Cal.App.4th 325, 328.)

We need not answer this question, because the trial court did not err in any event. Under section 352, "the trial court enjoys broad discretion in assessing whether the

31.

probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.] Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)

Murder is, in our view, not nearly as probative of dishonesty as defrauding an innkeeper, which the trial court ruled could be used to impeach McGillivary's testimony at trial. As noted, the arrest and indictment for murder could not have affected McGillivary's testimony when it was actually given, as they had not yet happened. Under the circumstances, in order for jurors to decide whether the arrest and indictment actually affected McGillivary's credibility (and if so, to what extent), they would have to know something about the alleged conduct that gave rise to the murder charge. This would have necessitated a trial within a trial, with the attendant potential for confusion of the issues and undue consumption of time on a point that was, at most, of minor probative value. (Compare *People v. Quartermain* (1997) 16 Cal.4th 600, 624 with *People v. Jennings* (1991) 53 Cal.3d 334, 371-372.) "[S]ection 352 'empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues.' [Citation.]" (*People v. Chatman* (2006) 38 Cal.4th 344, 372.) The trial court here did not abuse its discretion in excluding evidence of McGillivary's arrest and indictment for murder. (See, e.g., *People v. Suff* (2014) 58 Cal.4th 1013, 1065-1067; *People v. Verdugo* (2010) 50 Cal.4th 263, 290-291; *People v. Hart* (1999) 20 Cal.4th 546, 606-607; *People v. Tuggles* (2009) 178 Cal.App.4th 1106, 1128-1129.)

Nor did the court abuse its discretion by excluding visual depictions of McGillivary's appearance and demeanor while testifying at the preliminary hearing. We recognize the importance, to a credibility determination, of a jury's ability to observe a witness's demeanor. (See *People v. Arreola* (1994) 7 Cal.4th 1144, 1155.) Here,

however, there was no suggestion the jury would be allowed to view the whole of McGillivary's testimony; rather, jurors would have been at the mercy of the media's determination of what was most newsworthy or dramatic. The likelihood McGillivary's overall demeanor would be misrepresented due to editing cannot be gainsaid. (See *People v. Moran* (1974) 39 Cal.App.3d 398, 411 [video of entirety of witness's testimony was presented to jury "so that there were no opportunities for any misrepresentations of the testimony by editing or shortcutting"].)

More importantly, McGillivary's colorful character and demeanor were readily apparent, even on a cold transcript.[31] For instance, this occurred at the outset of McGillivary's testimony:

"[PROSECUTOR]: Thank you. Your Honor, at this time, the People call Caleb Lawrence McGillivary.

"THE WITNESS: Otherwise known as —

"[PROSECUTOR]: Kai, Your Honor.

"THE WITNESS: Solemn affirmation I will tell the truth, the whole truth and nothing but the truth.

"THE COURT: Just a moment. Listen to the clerk as she states the oath to you so you can respond to it. And you only need one hand, the right hand. Thank you.

"THE CLERK: Do you solemnly state, under penalty of perjury, that the testimony you are about to give in the matter now pending before this court shall be the truth, the whole truth, and nothing but the truth?

"THE WITNESS: God being Sophia, yes.

---

[31] Rather than have a single person read the preliminary hearing transcript to the jury, the trial prosecutor and defense counsel read the questions and statements of their counterparts at the preliminary hearing, the trial court read the magistrate's comments, and there was a reader on the witness stand who read McGillivary's testimony. Although all sustained objections were redacted, portions where the magistrate interjected to document motions McGillivary was making or for other reasons were retained.

"THE COURT: Sir, can you tell us your first name.

"THE WITNESS: As it appears on paper?

"THE COURT: Yes.

"THE WITNESS: The one that applies to me is Caleb Lawrence McGillivary, born September 3rd, 1988 in Alberta, Canada."

A short time later, during the prosecutor's questioning of McGillivary about the marijuana he and defendant smoked, this took place:

"Q  And did you bring [the marijuana] back to the car?

"A  Yes, I did.

"Q  Is that in a baggy of some type or a bag?

"A  That is correct.

"Q  Okay.  What type of bag?

"A  Plastic, made out of dinosaurs.

"Q  I'm sorry?

"A  It is plastic.  It was made out of dinosaurs, fossil fuels.

"Q  And at some point, did you and the defendant smoke some of that marijuana?

"A  Yeah, over at the recycling depot.

"Q  And was that smoked out of a joint or a pipe?

"A  A joint with papers, no pipe.  I don't smoke out of other people's pipe and I wasn't carrying one.

"Q  Who rolled the joint?

"A  I rolled the joint.

"Q  And did you share the joint with the defendant?

"A  I suppose that's a matter of perception.  You could say he shared the joint with me.

34.

"Q  You guys passed it back and forth with that kind of thing?

"A  The joint shared itself with us."

And, during the prosecutor's questioning of McGillivary about the immediate aftermath of the collision, the following took place:

"Q  What was Mr. Neely doing as he was pinned?  Were you able to see him?

"A  As I says, he was going, holy, get this fucking car off me.  And his eyes was fucking rolling in his head and shit and he was all crushed up.

"THE COURT:  For the record, the witness was standing up and leaning backwards in describing his last answer.

"[PROSECUTOR]:  Okay.

"THE WITNESS:  The chair pinning me to the desk, for the record.

"THE COURT:  Thank you."

The foregoing are only three of numerous examples.  The jury did not need visual aids to ascertain McGillivary's demeanor or attitude toward testifying, and in fact defense counsel commenced his summation by forcefully arguing McGillivary was not a credible witness.

We recognize that section 352 and other evidentiary rules "must yield to a defendant's due process right to a fair trial and to the right to present all relevant evidence of *significant* probative value to his or her defense.  [Citation.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 999.)  Nevertheless, we reject defendant's "attempt to inflate garden-variety evidentiary questions into constitutional ones [as] unpersuasive." (*People v. Boyette* (2002) 29 Cal.4th 381, 427.)  "'As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [constitutional] right to present a defense.  Courts retain … a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice.  [Citations.]'" (*People v. Cudjo* (1993) 6 Cal.4th 585, 611.)  The trial court

35.

neither abused its discretion under state law nor violated defendant's rights under the federal Constitution. (See, e.g., *People v. Whisenhunt* (2008) 44 Cal.4th 174, 208; *People v. Jenkins* (2000) 22 Cal.4th 900, 1014-1015.)

## II

### OVERRULING OF DEFENSE OBJECTIONS

A. **Background**

During in limine motions, defendant objected, under section 352, to admission of the portion of McGillivary's preliminary hearing testimony dealing with defendant's statements about raping a 14-year-old girl in the Virgin Islands when defendant was 30. Defendant asked that this testimony be removed when the preliminary hearing transcript was read to the jury, as the incident had little if any relevance, was remote in time, would likely lead to confusion of the issues and undue consumption of time, and was prejudicial. The court observed that excluding the subject would not be easy, because the issue was addressed several times throughout McGillivary's testimony. The prosecutor pointed out that defendant also raised the subject in his interview with law enforcement. Defendant also asked that this reference to the incident be excluded, while the prosecutor argued it corroborated McGillivary's testimony. The prosecutor also argued defendant had been confessing his past transgressions, had considered he might die that day, and made statements that he believed people were after him. She further argued the subject was relevant to explain McGillivary's actions, particularly why he struck defendant with the hatchet.

After further argument and discussion of whether the doctors who might testify in the case were aware of the statement, the court ruled:

> "It appears to the Court that to the extent that this statement explains the witness's conduct, also that the account was addressed by the defendant during any interview with law enforcement, and that the account of whatever took place in the Virgin Islands may have been relied upon by the doctors who may be testifying in this case, that it would be probative of the

36.

state of mind of the defendant, in that the statement, as indicated by Mr. McGillivary, was made shortly before the alleged attempt to kill and the assaults alleged in the Information.

"So the Court finds that the probative value as to the state of mind of the defendant, the explanation of the actions by the witness and any reliance the doctors had upon that statement in reaching their conclusions, it appears to the Court that the probative value is not substantially outweighed by the probability that it would necessitate the undue consumption of time.

"… [T]he references in the preliminary hearing and the testimony given by Mr. McGillivary is [*sic*] actually pretty short in the scheme of his testimony.  And when I say references, I mean use of the word 'rape.'  Also, in this Court's mind, does not create a substantial danger of undue prejudice.  That in this instance, the alleged conduct would have took [*sic*] place some 20 years prior to what is alleged here.  And it comes down to the characterization of the witness, Mr. McGillivary, and the statement of Mr. McBride to law enforcement as to what took place in the 20 years prior.  The Court is satisfied there will be no confusion of the issues because … it has already been made clear to the jurors that this case concerns events from 2013, involving events in Fresno County, and injuries that are suffered by individuals as a result of that event in Fresno County.  And the Court does not believe that would mislead the jurors as to any issue, but actually that may be probative of, again, the mental state of the defendant immediately prior to the events at issue in this case.

"So the Court will allow the references that Mr. McGillivary makes at the preliminary hearing, as well as the references that Mr. McBride apparently makes in his speaking with law enforcement to be received by the jurors."

Later during trial, before Lomeli testified, defendant objected, pursuant to section 352, to testimony that he yelled "88" in the hospital, as well as gang officers' opinions concerning the term's meaning.  Defendant argued the evidence had no probative value and would result in confusion of the issues.  The prosecutor responded that the officers had the training and knowledge to provide an opinion, in addition to which one officer heard defendant ask a nurse if the nurse "was a Jew."  The prosecutor argued this was relevant, given the nature of defendant's statements to which some of the witnesses testified.  Defendant conceded the officers had the knowledge, training, and foundation to

37.

testify that White supremacist gang members use the term "88" to refer to Adolph Hitler, but asked that the evidence be excluded because there was no evidence linking defendant to White supremacist gang members, thus creating a substantial danger of undue prejudice, confusing issues, and misleading the jury. The court ruled:

> "It appears to the Court that the statement could be received because it is a statement made by the defendant, it is a spontaneous statement, and it is not subject of any interrogation by law enforcement, so that it can be received. I think it can be probative, it may be probative of a motive in light of the other statements that persons have attributed, who have already testified in this case, have attributed to Mr. McBride concerning certain racial slurs or epithets. So I don't believe it would be necessary for these witnesses to draw a link between Mr. McBride and his involvement in a [W]hite [s]upremacist gang. In fact, I know generally when persons are trying to lay the foundation for a gang expert, it is quite lengthy. I would not anticipate that would be necessary here.
>
> "Basically, if these gentlemen were to testify about their familiarity with the term, they can simply state how they're familiar with it, without going into what training they have concerning gang mentality and all of the aspects of gangs. I think that would be … unnecessary and would constitute an undue consumption of time under Evidence Code section 352. But I don't think the expression of the opinion itself would violate Evidence Code section 352. I don't see that, given that, again, statements have already been attributed to Mr. McBride and given the accusations in this case, attempted murder. I just don't see that."

After further argument, the court reiterated: "It is not going to confuse the issues, because still the issue is whether Mr. McBride did any of the things that he is accused of.… He has already been accused of certain conduct and making certain statements. In a separate context, in a hospital, rather than at the scene, there is further conduct that has some bearing on what may have taken place at the scene. I think that is pretty relevant. And I don't think that will be confusing the issues. So I am going to allow it."

The testimony that was presented to the jurors as a result of the trial court's ruling in each instance is set out in the statement of facts, *ante*. Defendant now contends the trial court abused its discretion in allowing what he claims is "bad character evidence,"

as, he says, the subject matters were inherently prejudicial and lacked significant probative value to the issues. He says admission of the evidence violated his federal constitutional right to due process of law. We conclude any error was harmless.

## B.    Analysis

"[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the relative probativeness and prejudice of the evidence in question [citations]. Evidence is substantially more prejudicial than probative [(under § 352)] if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome' [citation]." (*People v. Waidla* (2000) 22 Cal.4th 690, 724.) "'The prejudice which exclusion of evidence under … section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.] 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors. [Citation.]' [Citation.]" (*People v. Zapien* (1993) 4 Cal.4th 929, 958.)[32]

We turn first to the expert testimony concerning the meaning of the term "88." As the California Supreme Court has explained, "First, the decision of a trial court to admit expert testimony 'will not be disturbed on appeal unless a manifest abuse of discretion is shown.' [Citation.] Second, 'the admissibility of expert opinion is a question of degree.

---

[32]    Defendant includes a discussion of section 1101 in the portion of his opening brief titled "Standards for Admissibility and Review." Subdivision (a) of that statute renders "propensity" evidence generally inadmissible. (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1056.) Because defendant did not object to the challenged evidence under section 1101 at trial, any contention under that statute is forfeited. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 408; *People v. Alexander* (2010) 49 Cal.4th 846, 912.) Our analysis is properly one under section 352 (*People v. Dement* (2011) 53 Cal.4th 1, 36), which takes into account the possibility a jury may consider the challenged conduct as evidence of defendant's propensity to commit crimes (*People v. Williams* (1988) 44 Cal.3d 883, 904).

The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard. Instead, the statute declares that even if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would "assist" the jury. It will be excluded only when it would add nothing at all to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness."' [Citation.]" (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299-1300.)

Under the circumstances of this case, there can be little doubt the meaning of "88" was a proper subject for expert testimony. Defendant does not appear to contend otherwise, or that the officers who testified were not qualified as experts on the subject.

The "wide discretion" afforded a trial court under section 352 extends to the admission or exclusion of expert testimony. (*People v. Richardson* (2008) 43 Cal.4th 959, 1008.) In our view, testimony defendant was spouting phrases with possible racist or White supremacist connotations was highly probative of his motive for committing the charged offenses, and whether he harbored the specific intent to kill required for conviction on count 1. (See *People v. Lindberg* (2008) 45 Cal.4th 1, 45; *People v. Quartermain*, *supra*, 16 Cal.4th at pp. 627-628.)[33] This is particularly true since some, but not all, of the eyewitnesses at the scene testified to hearing him make racial remarks. Even if we liken the challenged evidence to evidence of gang membership, as defendant would have us do, such evidence is admissible where, as here, it is not "only tangentially relevant" (*People v. Gurule* (2002) 28 Cal.4th 557, 653) and its probative value is more than "minimal" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049).[34] "Though[, as

---

[33] That the jury acquitted him on that count does not change this.

[34] Although several of the officers who responded to the scene of the collision and/or the hospital were members of a multijurisdictional gang unit, their testimony clearly showed they responded because they were on patrol, not because this was somehow

40.

demonstrated by defendant's testimony,] the meaning of the disputed [statements] was perhaps open to interpretation, a sinister construction was reasonable. Under these circumstances, it was for the jury to make the determination. [Citation.]" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1142, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

The rape references present a closer question. In our view, they had at least some relevance to defendant's state of mind, both at the time of the collision and later, when he was interviewed by detectives. They were also at least marginally relevant to McGillivary's credibility, particularly in light of defendant's attempt to portray McGillivary as at least partially the catalyst for events. (See *People v. Bolin* (1998) 18 Cal.4th 297, 319-320; see also *People v. Freeman* (1994) 8 Cal.4th 450, 491 [evidence is relevant when, no matter how weak, it tends to prove issue before jury].)

We need not decide whether the trial court abused its discretion by admitting the rape evidence, since any error was harmless. "The erroneous admission of … evidence requires reversal only if it is reasonably probable that [defendant] would have obtained a more favorable result had the evidence been excluded. [Citations.]" (*People v. Avitia* (2005) 127 Cal.App.4th 185, 194; see *People v. Watson* (1956) 46 Cal.2d 818, 836; accord, *People v. Whitson* (1998) 17 Cal.4th 229, 251.) Here, the evidence against defendant on the assault charges was strong, and defendant's convictions did not merely depend on the jury's assessment of McGillivary's credibility.[35] Defendant's protestations notwithstanding, the fact he was acquitted of attempted murder and battery

---

believed to be a gang-related incident. Thus, and in light of the evidence as a whole, there was no danger jurors would have believed defendant was a gang member.

[35]    In his discussion of cumulative prejudice, defendant talks about evidence he was unconscious, as that term is used in the law. Defense counsel argued, and the trial court instructed on, accident, not unconsciousness.

shows the jury "'considered the evidence dispassionately in reaching its verdict.' [Citation.]" (*People v. Chatman*, *supra*, 38 Cal.4th at p. 370.)

Defendant contends his due process rights were violated, and so any error requires reversal unless it can be shown to be harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.) He is wrong.

"To prove a deprivation of federal due process rights, [a defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.] 'The dispositive issue is … whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." [Citation.]' [Citation.]" (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229-230, fn. omitted.) Because the evidence here had at least some relevance, its admission did not violate defendant's due process rights. (*People v. Foster* (2010) 50 Cal.4th 1301, 1335.) Moreover, in light of the other evidence presented at trial, even if the rape references were completely irrelevant, this case would not present "one of those rare and unusual occasions where the admission of evidence has violated federal due process and rendered the defendant's trial fundamentally unfair." (*People v. Albarran*, *supra*, 149 Cal.App.4th at p. 232.)

## III

### CUMULATIVE PREJUDICE

Defendant contends the errors he claims occurred during trial had the cumulative effect of undermining his right to a fair trial. We disagree. We have found one possible error — the overruling of defendant's objection to the rape references. We have

concluded it was not prejudicial. There is no error to cumulate, and no cumulative prejudice. (See *People v. Koontz* (2002) 27 Cal.4th 1041, 1094.)

## IV

## CORRECTION OF CLERICAL ERRORS

The minute order of April 4, 2013, contains the following:

"**7 Defendant's motion to WITHDRAW NOT GUILTY PLEA to count(s) 1, 2, 3, 4 granted.**

"8 Defendant enters plea of Not Guilty by Reason of Insanity as to all counts."

The reporter's transcript of the proceedings shows defense counsel stated defendant would be maintaining his not guilty plea and entering an additional plea of not guilty by reason of insanity. Whereupon defendant personally entered his plea of not guilty by reason of insanity. Defendant did *not* withdraw his not guilty plea.

Defendant now requests that we order correction of the clerical error. The Attorney General has no objection. We will order the correction. (See, e.g., *In re Candelario* (1970) 3 Cal.3d 702, 705.)

Defendant also requests that item 7 of the minute order of January 22, 2014, be corrected. That item states: "Court finds The Court finds that sanity has not been restored.." (*Sic*.) Defendant contends the reporter's transcript of the proceeding "reflects that the court made findings of fact based on the trial evidence that 'the sanity of the defendant has been recovered fully.'" Defendant and the Attorney General, who again does not object to the proposed amendment, appear to have misread the record. According to the reporter's transcript, the trial court stated: "Having heard and reviewed the evidence in this case, it does *not* appear to this Court that the sanity of the defendant has been recovered fully." (Italics added.) We see no material discrepancy between the court's statement and the minute order, and decline to order any amendment.

43.

Our review of the record reveals one other error that must be corrected. In the course of the February 20, 2014, hearing regarding the appropriate placement of defendant, the court mistakenly recited that the jury found true, as to counts 2 and 3, an enhancement pursuant to Penal Code section 12022.7, subdivision (e). In reality, defendant was alleged and found to have inflicted great bodily injury, with respect to both counts, under subdivision (a) of Penal Code section 12022.7.[36] This misstatement of the applicable subdivision (which did not impact the court's calculation of the maximum term of confinement) was carried over into the minute order of the hearing and the written order of commitment. We shall order correction of the minute order and written order of commitment.

## DISPOSITION

The judgment is affirmed. The trial court is ordered to cause to be corrected the following errors, and to have certified copies of the corrected documents transmitted to the appropriate authorities:

1. Item 7 of the minute order of April 4, 2013. This item shall be corrected to read: "Defendant's motion to maintain his not guilty plea and enter an additional plea of not guilty by reason of insanity to count(s) 1, 2, 3, 4 granted."

2. Item 10 of the minute order of February 20, 2014. The reference to "Penal Code section 12022.7(e)" shall be corrected to read "Penal Code section 12022.7(a)."

---

[36] Subdivision (e) of Penal Code section 12022.7 deals with the infliction of great bodily injury in the commission of a felony under circumstances involving domestic violence.

3. The "ORDER OF COMMITMENT TO ATASCADERO STATE HOSPITAL [PENAL CODE SECTION 1026]," dated February 20, 2014. The references to "Penal Code section 12022.7(e)," found at line 28 of page 1, and lines 1 and 15 of page 2, shall be corrected to read "Penal Code section 12022.7(a)."

_____

DETJEN, J.

WE CONCUR:


_____

POOCHIGIAN, Acting P.J.


_____

PEÑA, J.

45.